## SERVICE AGREEMENT

WHEREAS, the Federal Bureau of Investigation (hereinafter referred to as the FBI) is conducting a lawful Undercover Operation (herein referred to as the UCO) in order to fully identify and obtain evidence regarding a group of individuals who are known to be committing certain criminal activities to include the excavation, selling, purchasing and interstate transportation of stolen artifacts,

Whereas the prosecution of the individuals associated with the described illegal activities is a priority of the FBI and the Department of Justice; and,

Whereas Ted Dan Gardiner, herein referred to as TG, is in a position, and is willing to furnish assistance to the FBI and its investigation; and,

Whereas the parties hereto desire to record their respective interests and obligations;

NOW, therefore, the parties hereto agree as follows:

## RESPONSIBILITIES OF THE PARTIES

1.   TG understands that he/she is not an employee, partner, member of a joint venture, or Agent of the FBI, nor will the TG identify or hold himself/herself out to be such.

2.   TG will attempt to re-establish and/or develop relationships with, and gain the trust of individuals involved in the illegal excavation, transportation, sale and possession of stolen archeological artifacts in the Four Corners and surrounding area. TG will not contact any member of a group known to be involved in such illegal activity and more specifically, any subjects of the UCO, at any time during the course of the UCO, without first being authorized to do so by the FBI. TG will immediately advise SA Gibson M. Wilson, or any other designated FBI official involved in this investigation, any time contact is made with individuals involved in these schemes or crimes. TG understands that his/her activities and association with these individuals may be limited at any time by the FBI during the course of this UCO to protect the integrity of the investigation.

3.   TG agrees to provide truthful information to the FBI during all conversations, communications and transactions pertaining to this UCO. TG agrees to share with the FBI all personal knowledge, information, electronic records, documents, photographs, ledgers, accounting statements, business records, etc. in his/her possession, custody or control which pertain to the excavation, sale, purchase and interstate transportation of stolen artifacts. TG agrees to continue to provide such additional information to the FBI as TG becomes aware of it throughout the entire course of this investigation. TG agrees to testify in either state or federal court, if directed to do so by the Department of Justice, in all prosecutions stemming from cooperation with the FBI in this UCO.

1

4.  TG will not participate in any unlawful activity except in those limited circumstances where specific direction and permission have been provided and granted by the FBI and such unlawful activity has been deemed necessary by the FBI to carry out one or more of the goals or objectives of the UCO. Authorization for TG to engage in unlawful activity will be specific to particular activities, transactions, dates, events or other circumstances which will be clearly defined by SA Gibson or another FBI agent acting in his/her place, prior to engaging in any such unlawful activities. TG hereby acknowledges and understands that any violation of law not expressly authorized by the FBI may result in the prosecution of TG. If TG has any question as to the legality of a particular activity or transaction, TG should express this concern to the FBI official involved in this investigation and the issue will be addressed prior to engaging in the particular activity or transaction.

5.  TG has no authority, expressed or implied, to obligate or bind the FBI to any lease, purchase of real property, contractual duty or any other legal obligation, and any such legal obligation made by TG is the sole obligation of TG and not of the FBI. TG will be permitted to expend funds provided to him/her during the course of this investigation which will be specifically designated to acquire artifacts as directed by an FBI agent involved in this UCO. Funds to purchase evidence will not be used by TG for any other purpose and any remaining funds will be returned immediately to the FBI agent overseeing the transaction as soon as the transaction is completed. TG understands that all artifacts purchased through funds provided to TG by the FBI are evidentiary purchases and the title and ownership to the artifacts shall be vested in the FBI. TG agrees to surrender all such evidence purchases to the FBI as soon after the purchase as is practicable. In the event TG is requested to sell one or more artifacts on behalf of the FBI, TG acknowledges that the FBI will set the terms and conditions of any such transaction and the FBI will receive the entire proceeds of any such sale.

6.  TG currently has a sole proprietorship which includes the use of a computer and website to advertise artifacts and to exchange electronic communications with potential purchasers and sellers of artifacts. TG agrees to affirmatively provide the FBI with copies of any and all documents, messages, emails, or other electronic transactional records wherein TG becomes aware of efforts of a seller or buyer to engage in any transaction pertaining to stolen artifacts. This is in addition to TG's agreement in the Hold Harmless Agreement to provide the FBI with full and unlimited access to TG's web site, personal computer, business records and files, etc. to ensure that the FBI is fully aware of all of TG's artifact business related activities during the course of this UCO. TG will be provided with specific instructions on the type of activities TG may engage in using the website and or email associated with the website in order to comply with current investigative guidelines and TG agrees to comply with these instructions and guidelines.

7.  If requested, TG will permit an undercover FBI employee to send and receive emails associated with the proprietary business in order to set up transactions of stolen artifacts.

2

## REIMBURSEMENT/PAYMENT FOR SERVICES RENDERED

8. The FBI may, at its sole discretion, reimburse TG for any expenses incurred by TG that the FBI deems to be reasonably incurred in furtherance of this investigation. TG agrees that prior to incurring any expenses that TG believes to be related to the investigation, TG will consult with the designated FBI official as to the nature of, and justification for incurring the expense. TG agrees to provide vendor receipts for these reimbursements. The FBI has the right to direct TG not to incur any expense that the FBI deems not to be reasonable, or in furtherance of the investigation. TG shall be liable for all expenses which are not previously approved by the FBI. Should there be a dispute as to whether an expense was reasonable; the FBI Contracting Officer of record will be the final arbiter of that dispute.

9. The FBI hereby agrees to pay TG an amount, not to exceed $7,500 per month, for services rendered as a part of TG's participation in this UCO. Payments will made only after TG has performed the requisite services for the prior month period. It should be fully understood that the amount paid per month will include such factors as TG being timely to meetings, accurately following instructions, complying with guidelines and rules, fully cooperating with investigators, promptly returning phone calls, providing accurate and detailed reports, etc. The FBI will make an effort to provide payment to TG as soon as is practicable after services for the prior month period have been completed. In the event this UCO is terminated for any reason, including a lack of sufficient investigative funds, the FBI has no further obligation to pay TG for services other than for those services already rendered to date which will be reimbursed on a pro rata basis for services rendered up to the date of termination of the UCO or TG's services.

10. The above payments shall be paid only so long as the covert part of this investigation is ongoing. TG shall not be guaranteed payment of any kind from the FBI for trial testimony or other services which will be required of TG in preparation for trial.

11. TG acknowledges that all such service payments are to be reported to the appropriate state and/or federal taxing authorities and declared as income for the year in which they are paid.

## LIABILITY OF THE PARTIES

12. The FBI bears the liability of any willful or negligent acts of its agents or employees. Liability for any negligent or willful act of TG that TG undertakes without the prior express authorization of the FBI, are the sole responsibility of TG. TG does not hereby waive any right or claim to which he/she may be entitled to under the Federal Tort Claims Act.

3

## **CONFIDENTIALITY**

13.   TG will not reveal the confidential and sensitive nature of this investigation, or identify any FBI or other government employee or cooperating witness to any unauthorized person(s). TG will not undertake any publication or dissemination of any information or material that relates to, or results from this investigation without the prior written authorization of the FBI.

15.   The FBI will make a diligent effort to conceal from the general public, the nature of TG's assistance and relationship with the FBI during the covert portion of this investigation. However, TG understands that in certain circumstances, his/her identity might have to be provided to investigators, prosecutors, judges or other appropriate officials to further this investigation. TG hereby acknowledges that his/her participation in this UCO will eventually be made public and TG will be called as a witness to testify in open court regarding TG's activities in this UCO.

## **DURATION OF THIS AGREEMENT**

16.   This agreement will commence on the date of acceptance by TG as signified by his/her signature or the date of the final UCO approval, whichever is later, and will continue until the FBI achieves the goals of this investigation, adequate funding no longer exists, or the FBI deems that TG's cooperation is no longer needed. The FBI will notify TG in a timely fashion when it becomes aware that this agreement will be terminated.

17.   It is understood that the FBI, at its sole discretion, will control all investigative activities, including any decision to terminate this investigation.

18.   This document, along with the accompanying Hold Harmless Agreement of the same date and pertaining to the same parties, are to be read and construed together, and together, they constitute the full and complete agreement between TG, TG's business and the FBI. Any modification to this agreement must be made in writing, and shall be signed by both TG and the proper FBI officials.

4

By subscription of their signatures below, the parties herewith acknowledge that they have read and understand the agreement, and will abide by the foregoing statements.

_[signature]_ 3/17/07
Ted Dan Gardiner — Date

_[signature]_ 3·19·07
Witness — Date

_[signature]_ 3/19/07
Witness — Date

_[signature]_ 3-21-07
Timothy J. Fuhrman, Special Agent in Charge — Date

_[signature]_ 3/15/2007
FBI Contracting Officer — Date
Maury V. Taylor
Contracting Officer
Federal Bureau of Investigation

_subject to availability of funding_ MVT